TECHNASSOCIATES, INC.

v.

The UNITED STATES.

No. 705–86C.

United States Claims Court.

Jan. 27, 1988.

---

David R. Smith, Rockville, Md., for plaintiff.

Linda T. Maramba, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Kenneth MacKenzie, Veterans Admin., of counsel.

## OPINION

YOCK, Judge.

This contract case is currently before the Court on defendant's motion to dismiss. For the reasons discussed herein, the defendant's motion is granted and the plaintiff's complaint is to be dismissed without prejudice.

### Facts

On September 27, 1982, the Veterans Administration (VA) entered into a contract (No. V101(93)P–913) with the Small Business Administration (SBA) pursuant to section 8(a) of the Small Business Administration Act, 15 U.S.C. § 637(a) (1982). The SBA was to provide technical analysis, design and development of computer software for an Interactive Medical Facilities Planning System. The contract consisted of two phases. Phase I was a cost plus fixed-fee arrangement for the analysis and design of the software. The ceiling price for Phase I of the project was $137,772 with a six-month term from the date of notice to proceed. Phase II was a firm fixed-price arrangement for the development, implementation and testing of the system designed in Phase I. The firm fixed price for Phase II was to be negotiated upon completion of the specified term for Phase I.

On September 30, 1982, the SBA entered into a subcontract with the plaintiff, Technassociates, Inc. (TI), for performance of the VA contract (Subcontract No. SB3–4–0–8(a)–82–C–4983). The responsibility for the administration of the subcontract was delegated by the SBA to the VA.

TI fully performed Phase I of the subcontract. The Phase I designs and deliverables were accepted by the Government on or about August 19, 1983. Negotiations as to the firm fixed price for Phase II of the subcontract were then entered into and agreed upon. Development and implementation of Phase II was to commence on September 1, 1983 and be completed on August 31, 1984 for a fixed price of some $392,919.

Almost immediately, TI began to experience difficulties meeting delivery schedules under Phase II of the subcontract. On October 20, 1983, the contracting officer wrote to TI stating (in pertinent part):

It has been brought to my attention that we are experiencing problems with the performance of work as contemplated by Phase II of contract V101(93)P–913. This was discussed in the first progress meeting which was attended by your company representatives and the contracting officers [sic] technical representative.

An invoice was presented for payment of ¹⁄₁₂th of the phase II amount although the delivered work compared to the work which should have been delivered was insufficient due to lack of performance. It was also brought to my attention that your company is experiencing difficulties in cash flow and subcontracting for this contract.

\*  \*  \*  \*  \*  \*

The COTR and I will closely monitor your progress for the next two months and if considerable improved performance is not evident appropriate action will be taken.

\*  \*  \*  \*  \*  \*

Please provide the plan requested above within five days after the receipt of this letter. Should you have any questions in this matter please feel free to contact me at 389–3125.

Again, on February 21, 1984, the Contracting Officer's Technical Representative (COTR) notified the contracting officer by memorandum that the plaintiff was still experiencing problems in performing Phase II of the contract. He complained specifically about ineffectual project scheduling, failure to provide required documentation, inadequate resource management and failure of the contractor to notify the COTR or contracting officer of key personnel changes. Thereafter, on March 2, 1984, the contracting officer met with the contractor for the purpose of discussing its poor performance. The agreements reached at that meeting were confirmed by the contracting officer in a letter dated

March 5, 1984 in which he stated in pertinent part:

> I expect this contract to be completed in accordance with the terms and conditions contained therein. I will take whatever action is necessary to see that this happens. I will be taking a stronger more active role in this contract until completed.

It was agreed at the March 2 meeting that the plaintiff would deliver a revised management plan and schedule to ensure completion of the contract. In its letter of March 2, 1984, to the contracting officer, TI acknowledged that "contract performance to date has been lagging behind the planned schedule and that recent staff changes have caused concerns about [TI's] ability to adequately complete the contract." As a result, TI also agreed to provide weekly status reports to the contracting officer and to inform the VA of any key personnel changes. TI's revised management plan noted September 10, 1984 as the contract completion date, with training and development to be completed by November 30, 1984. Although the completion date had not been formally extended, the contracting officer agreed to the delay at no additional cost to the Government.

The plaintiff's September 3, 1984 status report contained a revised work plan indicating that work would be completed by November 26, 1984. Once again, the contracting officer consented to the delay. The next status report was received by the contracting officer on October 1, 1984. This report again referenced November 26, 1984 as the project completion date. On October 15, 1984, the COTR informed the contracting officer that no work was performed on the contract from October 8–12, 1984.

Thereafter, in November 1984, the plaintiff submitted a revised schedule which indicated February 1985 as the new completion date. The schedule called for a demonstration of several parts of the program (modules) on November 16, 1984. On that date, all modules failed to perform as required.

On December 10, 1984, the contracting officer wrote to the contractor to again confirm the various agreements reached between TI and the VA at the meeting held between the parties on December 4, 1984. That letter recapped the various events that had occurred since the start of Phase II. He concluded in pertinent part that:

> An analysis of the above presented facts reveals that Technassociates has failed to appropriately manage the project, has misrepresented in the status reports the percentage of completion and has continuously submitted work plans which have not been adhered to.

He also indicated that the letter should serve as notification required by the Default Clause of the contract prior to any action to terminate the contract.

On January 4, 1985, the plaintiff submitted a revised work plan providing for completion of the project by June 1, 1985. In early February, TI again revised its work plan; however, no change in the contract completion date was made. By letter dated March 4, 1985, the plaintiff submitted a written request for a stop work agreement. The request was "premised upon the extreme financial hardship Technassociates would experience at the rate of expenditure necessary to meet existing delivery schedules without the recognition by VA of responsibility for changes in contract scope and attendant increased costs associated with delays in system access."

On March 12, 1985, the VA provided TI with written notice of default with ten days to cure all alleged deficiencies. TI responded by letter on March 25, 1985. In this letter, the plaintiff attempted to justify the nature and cause of the delayed project completion date. Also, TI sought to establish the "basis for our [future] request for equitable adjustment under the contract," and requested that the contract be changed from a fixed-price contract to a cost, no-fee basis. The letter stated in pertinent part:

> As you are aware, we at Technassociates, Inc. (TI) have undertaken a rigorous review of all aspects of performance under the subject contract. You will no doubt note in your review of the docu-

mentation included herein, that this effort is still not totally complete. However, in order to meet the time constraints of your ten day letter, we are submitting for your consideration the result of our analysis to date which fully documents and justifies the nature and cause of the schedule slippages referred to in your letter. In addition, this letter is intended to establish the basis for our request for equitable adjustment under the contract.

\* \* \* \* \* \*

The impact analysis, attached, reflects approximately 2,500 hours of compensable time due to out-of-scope system changes, system delays and criteria problems for which we believe we are entitled to an equitable adjustment under the contract. The dollar value of the 2,500 compensable hours amounts to approximately $213,300 through the fee line. This does not address the loss of efficiency encountered throughout the project due to the ripple effect of the system delays nor does it address the incremental cost of out-of-scope work included in the estimate to complete. These elements are presently being analyzed and will, of course, ultimately become a significant part of the total claim for an equitable adjustment.

As of March 15, 1985, we have incurred costs amounting to $535,000. It is our estimate, that the total additional hours required to complete the system as presently required by VA will be in the range of 3200 to 3300 hours estimated at $230,000. This assumes an April 1, 1985, resumption of productive effort by existing staff. This date is critical in that slippage beyond April 1 could cause staff continuity problems which can only serve to increase substantially the cost to complete and more importantly, jeopardize completion of the project altogether.

We at TI realize the value of this system to the VA and want to see this project move forward to successful completion certainly as much [sic] you do. In that regard, and as President and majority stockholder at TI, I offer the following proposal for the completion of the project. We will perform Phase II of the contract on a cost, no fee basis and we will warrant the system for a full one year period at no cost to the VA. Should VA accept our proposal for a cost no fee contract for all of Phase II, TI would formally release VA from all liability for any claim for equitable adjustment through the date of contract modification provided VA promptly processed all vouchers for incurred costs. We have already lost thousands of dollars on this project as a result of carrying professional staff on overhead during periods of delay and we stand to lose even more during the warranty period.

Following receipt of the plaintiff's March 25, 1985 letter, the VA went to the SBA and requested their approval to terminate the contract for default. The SBA, however, refused to consent to the termination for default but was willing to allow a termination for convenience.

On May 10, 1985, the plaintiff again wrote to the contracting officer stating in pertinent part:

This letter is a follow-on to our conversation concerning the referenced contract on May 7, 1985. First, I wish to reiterate our desire to reach an agreement with VA to continue work on this contract in a manner which is equitable to both VA and Technassociates, Inc. (TI). We believe that such an outcome to the present situation is the most economical one for VA and TI.

\* \* \* \* \* \*

We would appreciate an early decision concerning disposition of this contract. Should it be your desire to complete the project, as it is ours, we are prepared to meet with you to discuss those terms and conditions necessary to assure completion to the mutual satisfaction of both VA and Techassociates [sic]. At that time, we can discuss a proper disposition of costs required to complete the effort.

In the light of alternative decisions available to you at this time, we trust that your choice will be in the best interest of the Government.

On July 10, 1985, the plaintiff once again wrote to the contracting officer proposing that the parties enter into negotiations to establish a basis for completing the contract. The letter stated in pertinent part:

The purposes of this letter are to respectfully request that our letters of March 25, 1985 and May 10, 1985, be answered expeditiously and to continue our efforts in proposing an arrangement acceptable to the Veterans Administration for completing the work under the referenced contract on a firm fixed price basis.

\*   \*   \*   \*   \*   \*

Our letter of May 10, 1985, stated that we would appreciate an early decision concerning disposition of this contract. Further, we repeated our desire to complete the project and stated that we were prepared to meet with you to discuss the terms and conditions necessary to assure completion to the mutual satisfaction of both VA and TI.

\*   \*   \*   \*   \*   \*

We are, however, still vitally interested in finishing the work previously undertaken. We have developed a plan that we believe represents the most efficient way to proceed with the expressed needs to the Veterans Administration.

We request again your decisions regarding; 1) TI completing the work, 2) our request for equitable adjustment, and 3) disposition of the contract. After receipt of your reply and if you desire that we complete the work, we are prepared to make a presentation of our plan including a milestone schedule, an estimated cost report, and a fine line pert chart. Please provide your reply in ten (10) days.

Thereafter, on September 18, 1985, apparently without receiving a reply to the above-discussed letters, the plaintiff submitted to the contracting officer a settlement proposal on Government Standard Form No. 1436. In the cover letter to the settlement proposal document, the plaintiff stated:

As you are aware Technassociates has received no formal response to its letters dated March 25th, May 10th and July 10, 1985 which we believe were not only responsive to your cure letter but also established the basis for a substantial equitable adjustment under the referenced contract. We are also in receipt of a copy of a letter dated May 21, 1985 from the Small Business Administration which refuses to accept your recommendation that our contract be terminated for default and states that the agency would be amenable to the issuance of a termination for the convenience of the government. This has been and, as we understand it, continues to be the position of the Small Business Administration.

It has been nearly six months since we responded to your cure letter, and over four months since you received SBA's reply. These delays have caused Technassociates serious financial harm and, in no small measure, demonstrate a total lack of regard for the financial well being of our organization which has made substantial efforts and sacrifices to support your Agency's programs.

Accordingly, we are submitting herewith our convenience termination claim under Part 49 of the Federal Acquisition Regulations, *Terminations of Contracts.* We believe that our response to your cure letter, your lack of action regarding continuation of the contract work and the position of the Small Business Administration as set forth in its letter requires such a presumption on our part regarding the type of termination of this contract.

Enclosed is our Settlement Proposal for your review. Should you require any further information on this document, please do not hesitate to contact the undersigned at (301) 468–6191.

The plaintiff's Settlement Proposal (Government Standard Form No. 1436) included the following certification language:

CERTIFICATE

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has exam-

ined this termination settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (*exclusive of charges set forth in Item 14*) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract, they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (*exclusive of proposals filed against these immediate subcontractors by their subcontractors*); (2) the settlements on account of immediate subcontractors' own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make if reimbursement by the Government were not involved; (3) The Contractor has received from all its immediate subcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; and (4) the Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so re-

ceived, to the extent that it has not previously done so. The term "subcontractors," as used above, includes suppliers. [Emphasis in original.]

On October 4, 1985, the contracting officer responded to the plaintiff and stated (in pertinent part):

I have read your letter of September 18, 1985, concerning contract V101(93)P–913 and was very shocked and surprised at the tone of [y]our statements and the allegations and misstatements of fact.

\* \* \* \* \* \*

f. Any delays associated with this contract are entirely the effect of the negligence and irresponsibility of both Technassociates and SBA. I strongly object to your accusations of a total lack of regard for the financial well being of your organization on the part of this agency. Every office of the VA involved with this contract has been strenuously pursuing a resolution to the problem, but has received absolutely no positive action on the part of SBA or Technassociates.

g. I must also reject your termination claim since this contract has not been terminated. I must also request as I did in my March 12, 1985, letter that you immediately correct all deficiencies on the contract. At this point in time that means complete the project as agreed upon in the contract.

In summary, the VA, SBA and Technassociates entered into a contract to perform certain work for a fixed price. Technassociates as a subcontractor to SBA failed to perform consistently throughout the contract term even though the VA agreed to a revised schedule and a nine month extension of the contract time at no compensation to the VA for this delay. SBA offered little, or no assistance to the contractor and both SBA and Technassociates have failed to fulfill their obligations under this contract. Technassociates has failed to perform and completely abandoned the job in February of 1985. SBA has failed to comply with the provisions of the contract and issue a decision on my request for a default termination. Technassoci-

ates has filed an invalid claim since the contract has not been terminated.

My decision concerning this contract is as follows:

a. The contract has not been terminated.

b. You have not been ordered or requested to stop work.

c. No equitable adjustment claim has been filed.

d. SBA has failed to issue a decision and therefore, no further action can be taken by the VA.

e. Your termination claim is rejected as an invalid claim since no termination notice has been issued.

The contracting officer concluded the letter by stating that this was his final decision, that the decision could be appealed, and that any questions could be discussed with him on the telephone (number given).

Approximately one month later, the contracting officer terminated the plaintiff's contract for default by letter dated November 8, 1985. The letter stated in pertinent part:

After due consideration of all facts related to Technassociates' performance on the Interactive Medical Facilities Planning (IMFP) System contract, I find that you have failed to perform as required by the contract terms and conditions.

This is a contract under the SBA 8(a) program. The prime contract number is V101(93)P–913 dated September 27, 1982 and the subcontract number is SB3–4–0–8(a)–82–C–4983 dated September 30, 1982, with an effective date of October 18, 1982, for both contracts. You have not only failed to perform as required but have totally abandoned work on this project as of February 1985. You are in default of your contractual obligations and in accordance with the Default Clause of the contract, your right to proceed further with performance of this contract is hereby terminated. Your explanation for failure to perform are unexcusable [sic] and you will be held liable for any and all excess costs resulting from action initiated by the Veterans Administration to procure completion of

this IMFP project. The Government reserves all rights, and remedies provided by law or under the contract.

The contracting officer concluded the letter by stating that this was his final decision, and that the decision could be appealed.

On February 6, 1986, the plaintiff wrote to the contracting officer inquiring whether he had issued a final decision on its termination for convenience claim submitted on September 18, 1985. The letter stated:

By our written submission dated September 18, 1985, Technassociates, Inc. (TI) advised you that the above-referenced contract had been constructively terminated for the convenience of the Government by your complete inaction and failure to communicate with TI subsequent to March 25, 1985. Therein we enclosed a Termination Settlement Proposal in accordance with Part 49 of the Federal Acquisition Regulation, whereby, in accordance with the Contract Disputes Act, we executed the certification of our claim as set forth on Standard Form 1436. By letters dated October 4, 1985 and November 7, 1985, you rejected our claims as invalid on the basis that you did not deem the contract to have been terminated; and by letter dated November 8, 1985, you attempted to terminate the contract for default.

With respect to your letters of October 4, 1985, November 7, 1985 and November 8, 1985, and the expiration of the time period fixed by 41 U.S.C. § 605(c), please advise us as whether you consider one or more of your said letters to be the required final decision on the above-refereneced [sic] certified claim.

We require an immediate reply to this letter inasmuch as your compliance or failure to comply with 41 U.S.C. § 605(c)(2) affects certain time periods and certain actions that we or the appropriate forum may take under 41 U.S.C. §§ 601 *et. seq.*. [sic] We again certify that the above referenced claim is made in good faith, that the supporting data and documentation are accurate and complete to the best of the Contractor's knowledge and belief, and that the

amount requested therein accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

Having received no reply to its February 6, 1986 letter of inquiry, the plaintiff on November 5, 1986, filed a direct access suit in this Court under the authority of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 et seq. (1982).

In its complaint filed in this Court, the plaintiff seeks to have the default termination converted to a termination for convenience. Plaintiff contends (on the merits) that the delays in the project were caused by the Government's implementation of numerous out-of-scope changes and its failure to provide adequate access to certain computer equipment that was called for by the contract. In its original complaint, however, the plaintiff failed to seek any monetary relief. As a result, on February 4, 1987, the defendant filed a motion to dismiss for lack of subject matter jurisdiction. The Government contends that without a claim for money judgment, the complaint merely requests a declaratory judgment, which, it further contends, this Court is without jurisdiction to grant, citing United States v. King, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Also, the Government argues that the plaintiff never submitted a sufficient and properly certified claim to the contracting officer for his final decision. Thus, under the Contract Disputes Act of 1978, direct access in the Claims Court is precluded. For this proposition, the Government cites to W.M. Schlosser Co. v. United States, 705 F.2d 1336 (Fed.Cir.1983); Hoffman Construction Co. v. United States, 7 Cl.Ct. 518 (1985); and T.J.D. Services, Inc. v. United States, 6 Cl.Ct. 257 (1984), among other cases.

On April 1, 1987, the plaintiff filed a motion to allow an amended complaint, specially requesting the Court to convert the default termination to a termination for convenience, and that the plaintiff be awarded monetary relief of some $330,889.

The Government's jurisdictional motion is now ripe for decision.

*Discussion*

Since the Government has voiced no objection to the filing of the plaintiff's Amended Complaint (which includes the request for a specific monetary amount over $50,000), the Amended Complaint will be filed, and, as a result, the Government's declaratory judgment argument fades away as moot. What does not fade away, however, is the Government's position that the plaintiff has failed to file a sufficient and properly certified claim with the contracting officer, thereby precluding jurisdiction in this Court on its direct access claim. Although this matter is not entirely free of doubt in view of the unusual factual circumstances of this case, this Court believes that the Government's position is sound, and that the plaintiff's Complaint should be dismissed without prejudice so that it may resubmit its claim to the contracting officer for a decision on the merits, free of jurisdictional challenge. A jurisdictional impediment, of course, is never waived and may be raised at any time or at any stage of the proceedings.

The Contract Disputes Act of 1978 (CDA) requires that:

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer.

41 U.S.C. § 605(a) (1982). Likewise, the Disputes Clause which was incorporated into the contract herein stated in pertinent part:

(c)(i) As used herein, "claim" means a written demand or assertion by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract.

\* \* \* \* \* \*

(iii) A claim by the contractor shall be made in writing and submitted to the

contracting officer for decision. A claim by the Government against the contractor shall be subject to a decision by the Contracting Officer.

45 Fed.Reg. 35817 (May 28, 1980).

The claim being asserted by the plaintiff in this case is clearly one by the contractor against the Government. *Gunn–Williams v. United States,* 6 Cl.Ct. 820 (1984), motion to vacate denied, 8 Cl.Ct. 531, 534 (1985). The plaintiff in this case seeks to have the default termination converted to a termination for convenience and accordingly seeks monetary relief in the amount of some $330,889.

This being the case, the CDA requires that for claims in excess of $50,000, "the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable." 41 U.S.C. § 605(c)(1) (1982).

■ The contractor's claim submission and certification requirements enunciated by the CDA are mandatory and are jurisdictional prerequisites before a contractor can file a direct access suit in this Court. *W.M. Schlosser Co. v. United States, supra,* 705 F.2d at 1338; *W.H. Moseley Co. v. United States,* 230 Ct.Cl. 405, 677 F.2d 850, cert. denied, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982). *T.J.D. Services, Inc. v. United States, supra,* 6 Cl.Ct. at 260. Thus, the two questions for decision on the Government's motion are: first, did the plaintiff submit a sufficient claim to the contracting officer for final decision; and second, even if a sufficient claim was submitted, was the claim properly certified? If either of these questions are answered in the negative, this Court lacks the necessary jurisdiction to hear the plaintiff's direct access appeal herein.

■ In order to determine the sufficiency of a purported claim which would trigger the appeal mechanism of the CDA, the particular facts must be evaluated on a case-by-case basis. *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 645 F.2d 966 (1981). Therefore, to answer the first of the two questions, the Court must look especially hard at the plaintiff's letter of September 18, 1985 with the attached Settlement Proposal (Standard Form 1436).

■ To begin with, it should be noted that the September 18, 1985 letter with the attached settlement proposal was submitted to the contracting officer approximately two months before the contracting officer's default termination letter was issued to the plaintiff. Although the timing of the plaintiff's submission to the contracting officer is not necessarily fatal, it is somewhat incongruous to be appealing a default termination and requesting that the contracting officer convert the default to a termination for convenience, prior to the time that the default termination has even occurred. At the very least, of course, it will inevitably cause confusion and uncertainty on the part of the contracting officer as to what the plaintiff is really seeking. Unless the submission is crystal clear, the inevitable jurisdictional challenges will occur in the event that an appeal is later taken. In the case at bar, this jurisdictional challenge could have been avoided by the simple submission (or resubmission) by the plaintiff of its termination for convenience claim, properly labeled as such, requesting a final decision on a sum certain, properly certified, after the default termination had occurred. Had plaintiff taken this action, the contracting officer would have known precisely what he was dealing with, what he was expected to do, and (hopefully) would have acted accordingly. In any event, this Court has to deal with what did occur (*i.e.,* the facts) and not what should have occurred.

Perhaps the most serious flaw in the September 18, 1985 submission is that it equivocates when it comes to asking the contracting officer for a final decision. The plaintiff's September 18, 1985 cover letter to the contracting officer stated in pertinent part: "we are submitting herewith *our convenience termination claim* under Part 49 of the Federal Acquisition Regulations, Termination of Contracts.

* * * Enclosed is our *Settlement Proposal for your review. Should you require any further information on this document,* please do not hesitate to contact the undersigned * * *." (Original emphasis deleted, emphasis supplied.) The letter was signed by Mr. Howard G. Weinberg, Director of Contracts for TI.

The CDA and the Disputes Clause of this contract, of course, require that a claim, meaning a written demand by one of the parties, be submitted to the contracting officer for a final decision. Although the plaintiff uses the words "convenience termination claim" and includes a definite amount of money, nowhere can one find the requisite demand for that finite amount, nor the request for a final decision thereon. In *Hoffman Construction Co. v. United States,* 7 Cl.Ct. 518 (1985), this Court found those omissions to be a significant factor against finding that the claim had been sufficiently stated. In *Hoffman,* the contractor submitted a cover letter and table detailing certain cost items. There, the Court held that the contractor had not submitted a "claim." Rather the letter and table expressed a "willingness to reach an agreement as opposed to a demand that the contracting officer reach a final decision * * *." *Hoffman, supra,* 7 Cl.Ct. at 525. The same is true in the present case. Nowhere in TI's cover letter or settlement proposal is a final decision by the contracting officer requested. TI merely stated that it enclosed the "Settlement Proposal for your [the contracting officer's] review. Should you require any further information on this document, please do not hesitate to contact the undersigned * * *." One could just as validly view the September 18, 1985 letter as another attempt by the contractor to get the contracting officer to renegotiate the terms of the contract. In other words, a further attempt at negotiation. This is especially valid in view of the prior letters (March 25, 1985, May 10, 1985 and July 10, 1985) that the contractor had sent to the contracting officer which can only be viewed as negotiating letters. Those letters were clearly designed to keep the contracting officer from terminating the contract, and, in fact, to convert the contract to a cost plus no-fee contract from its fixed-fee status. Although the plaintiff used "claim" language in those letters, those letters were clearly not sent for the purpose of submitting a demand for a final amount of money and for a final decision. Those letters were sent to get the contracting officer to negotiate with it on the future direction of the contract. In this Court's opinion, the September 18, 1985 letter was one more attempt by the contractor to get the contracting officer to negotiate with him and as such was not meant to be a final demand, final decision claim. The September 18, 1985 letter falls far short of a written demand by the contractor for a final decision by the contracting officer. *See Hoffman, supra.* See also *ReCon Paving, Inc. v. United States,* 745 F.2d 34 (Fed.Cir.1984); *Straga v. United States,* 8 Cl.Ct. 61 (1985). *Accord J.M. T. Machine Co.,* 86–1 B.C.A. ¶ 18,684, *aff'd,* 826 F.2d 1042 (Fed.Cir.1987) (unpublished).

Even if the plaintiff's September 18, 1985 cover letter and settlement proposal were held to be a sufficient claim, however, the plaintiff would still have a certification problem to overcome. The CDA requires that claims in excess of $50,000 must be certified by the contractor. The certification mandate is:

> "one of the most significant provisions of the CDA. The importance Congress ascribed to the certification requirement as a mechanism to discourage the submission of unwarranted claims and encourage prompt settlements was fully discussed in *Lehman v. United States,* [230 Ct.Cl. 11] 673 F.2d 352 (1982) and need not be repeated here. Suffice to say that certification is not a mere technicality to be disregarded at the whim of the contractor, but is an unequivocal prerequisite for a post–CDA claim being considered under the statute."

*Fidelity Construction Co. v. United States,* 700 F.2d 1379, 1384 (Fed.Cir.1983).

Section 605(c)(1) of Title 41 of the United States Code reads:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting

data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

In the present case, the only certification language submitted by the plaintiff is found on the last page of the Standard Form 1436—Settlement Proposal.

### CERTIFICATE

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this termination settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (*exclusive of charges set forth in Item 14*) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices, they include only those charges allocable to the terminated portion of this contract, they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (*exclusive of proposals filed against these immediate subcontractors by their subcontractors*); (2) The settlements on account of immediate subcontractors' own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make if reimbursement by the Government were not

involved; (3) The Contractor has received from all its immediate subcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; and (4) the Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so received, to the extent that it has not previously done so. The term "subcontractors," as used above, includes suppliers. [Emphasis in original, certification signed by TI's president.]

■ The contractor's certification must clearly and unequivocally comply with the statute. Also, the certification must *simultaneously* state all three elements required by section 605(c)(1). *W.H. Moseley Co. v. United States, supra; Aeronetics Division, AAR Brooks & Perkins Corp. v. United States,* 12 Cl.Ct. 132, 135 (1987); *Palmer & Sicard, Inc. v. United States,* 4 Cl.Ct. 420, 424 (1984).

The plaintiff's alleged certification does not contain *any* of the three required elements. It does not state that the claim is made in good faith. It does not state that the data are accurate and complete to the best of the contractor's knowledge. Nor does it state that it accurately reflects the contract adjustment for which the contractor believes the Government to be liable.

■ In a February 6, 1986 letter to the contracting officer, the plaintiff stated that it "executed the certification of our claim as set forth on Standard Form 1436" and that it:

*again* certif[ies] that the above referenced claim is made in good faith, that the supporting data and documentation are accurate and complete to the best of the Contractor's knowledge and belief, and that the amount requested therein accurately reflects the contract adjust-

ment for which the Contractor believes the Government is liable. [Emphasis added.]

The problem with plaintiff's statements in its later letter is that it cannot "again" certify what it never properly certified in the first place. This attempt to retroactively certify its alleged claim after the contract was terminated for default is "ineffective under the Act and does not cure the original failure to certify the claim at the proper time." *W.M. Schlosser Co. v. United States, supra,* 705 F.2d at 1338. *See also W.H. Moseley Co. v. United States, supra,* 230 Ct.Cl. at 407–08, 677 F.2d at 852.

Since the plaintiff has failed to submit a sufficiently precise and certified claim to the contracting officer, this Court lacks the jurisdiction to hear the plaintiff's direct access appeal. TI must submit a sufficiently precise and properly certified claim to the contracting officer, pursuant to the mandates of the CDA, before the Court can acquire direct access jurisdiction. *T.J.D. Services, Inc. v. United States, supra,* 6 Cl.Ct. at 263.

When a contractor's claim is dismissed without prejudice for lack of jurisdiction, the proper course of action is: (1) prepare a sufficiently precise claim that demands a specific amount and requests a final decision; (2) properly certify the claim; (3) resubmit the certified claim to the contracting officer; (4) if there is then an adverse decision issued by the contracting officer, appeal either to the appropriate board or directly to this Court. *Skelly and Loy v. United States,* 231 Ct.Cl. 370, 685 F.2d 414 (1982); *T.J.D. Services Inc. v. United States, supra,* 6 Cl.Ct. at 263.

## CONCLUSION

For the reasons discussed above, the defendant's motion to dismiss is granted. The plaintiff's complaint is to be dismissed without prejudice.

Each party shall bear its own costs.