The **ROBERT IRSAY COMPANY**, Plaintiff,

v.

**UNITED STATES POSTAL SERVICE**, Defendant.

No. 90–103C.

United States Claims Court.

Oct. 4, 1990.

Joel L. Widman, Chicago, Ill., attorney of record, for plaintiff.

Richard C. Jensen, Office of Contracts & Property Law, U.S. Postal Service, Wash-

ington, D.C., attorney of record, for defendant.

## OPINION

HORN, Judge.

This case arises under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988). Plaintiff, The Robert Irsay Company, seeks a price adjustment to a contract entered into with the United States Postal Service. Plaintiff alleges that the Postal Service wrongfully withheld payment of $23,085.23, to which it was entitled.

Defendant filed a Motion to Dismiss, pursuant to Rule 12(b)(1) of the Rules of the United States Claims Court (RUSCC), alleging lack of jurisdiction and contending that the plaintiff had failed to file a claim within the meaning of the Contract Disputes Act. Based on a review of the submissions of the parties, the oral argument held on September 13, 1990, and a review of the relevant facts and legal precedent, the defendant's Motion to Dismiss is, hereby, GRANTED.

## BACKGROUND

On January 29, 1986, plaintiff entered into a contract with the Postal Service to replace exhaust fans at the Chicago Main Post Office (Contract No. 169958–86–V–0008). On April 30, 1986, Irsay advised the contract manager of the unforeseen presence of lead lining in some of the exhaust fan ductwork and indicated that:

. . . . .

This situation, not contemplated at the time of contracting, has and will continue to have an adverse effect on our performance of this part of our contract work.

If we are forced, because of this lead coating and lead lining situation, to resort to dismantling these fans using wrenches, chisels and sawcuttings, we anticipated, [sic] that the cost of performing this work will be severely impacted as well as extending the time required to accomplish this work.

At the present time, we are trying to determine, what must be done with re-spect to this problem of getting the work done while protecting the health and welfare of our (and your) personnel. With this in mind, and to insure that our work crews are not subjected to health hazards as a result of airborne lead and other metal fumes we have brought in Environmental Consultants (see attached letter) to conduct text on this work environment.

In the meantime, until we have the results of these tests, and some clear direction in the manner in which we could proceed, we have discontinued the use of cutting torches for this work, and are proceeding with the work using alternate methods.

Accordingly, by this letter, you are advised, that this unknown condition is having an adverse effect on our cost of performing this work, and the time for its performance and when these additional costs are known, we will submit our proposal for these additional costs.

The contract was subsequently modified on November 25, 1986 to provide for the disposal and replacement of existing duct work and other related equipment. Despite the earlier communication on April 30, 1986, which advised the government of the presence of the lead lining, no specific mention of the problem with the lead lining was included in a subsequent November 25, 1986 contract Amendment–Modification, which read as follows:

Description of Amendment/Modification
Remove and dispose of existing/furnish and install new ductwork, exhaust hoods, equipment roof curbs, etc., as per Contractor's proposal dated October 8, 1986. Pursuant to the above, the contract price is increased by $127,300.00 from $558,-269.00 to $685,569.00 and the contract completion date is extended by 135 calendar days from October 27, 1986 to March 10, 1987.

The Contractor hereby agrees that this consitutes [sic] complete and final settlement for all present claims and a waiver of all further claims against the U.S. Postal Service incidental to the above changes.

The modification is explicit in that it was intended to constitute complete and final settlement for all present claims and a waiver of further claims against the Postal Service incidental to the changes described in the modification.

The additional costs, which the plaintiff now attributes to the lead lining, were not reported to the Postal Service until three letters were submitted to the contract manager, Mr. Wm. Lawler, not to the contracting officer, Mr. Dennis L. Bryan, on April 4, 1988, on April 6, 1988, and on March 2, 1989.

The April 4, 1988 letter was sent to Mr. W. Lawler (the contract manager), and reported labor costs of $18,128.00:

> Gentlemen:
>
> We are submitting this letter, covering the problem we incurred in the removel [sic] of the existing exhaust fans, due to the unexpected lead lining that was inside of the equipment.
>
> Due to this condition, we were forced to do basically double the man hours in the removel [sic] of this equipment. We submit our additional labor costs of the lead lining and its removel [sic] for your consideration and change order issue.
>
> | — Area | System | Removal | Est.Hrs. | Act.Hrs. | Added Cost |
> | --- | --- | --- | --- | --- | --- |
> | Pent # 2 | TR–1 | 4/16/87 | 30 | 85 | $ 1707.00 |
> | Pent # 4 | TR–2 | 10/20/86 | 36 | 64 | 956.00 |
> | Pent # 3 | TR–3 | 8/8/86 | 38 | 80 | 1435.00 |
> | # 12 N.E. | TR–4A,B | 1/20/87 | 40 | 110 | 2392.00 |
> | # 12 N.W. | TR–5A,B | 6/20/86 | 45 | 90 | 1537.00 |
> | Pent # 2 | TR–6A,B | 7/10/87 | 36 | 96 | 2050.00 |
> | # 12 S.W. | TR–7A,B | 11/10/86 | 48 | 120 | 2460.00 |
> | # 12 S.W. | TR–8A,B | 6/18/86 | 50 | 142 | 3144.00 |
> | | | | 323 | 787 | $15,681.00 |
> | | | Additional Supervision 40 hrs. | | | 1,447.00 |
> | | | Lead removel [sic] from site | | | 1,000.00 |
> | | | | | Total | $18,128.00 |
>
> If any further data or information is required, so as to conclude this additional cost, please do not hesitate to contact us.

The April 6, 1988 letter, which was also sent to the attention of Mr. Wm. Lawler (the contract manager), reported costs of $4,957.23:

> Gentlemen:
>
> With reference to our letter of April 30, 1986, we submit this letter requesting our added costs for the equipment and supplies to correct the problem that prevailed at the subject site. Attached please find the survey and report we obtained covering the condition. The recommendations and corrective measures outlined by the C–Tek Company covering industrial hygiene were pursued and followed.
>
> Our costs for this equipment and materials is attached as follows:
>
> Breakdown
>
> C–Tek Survey Cost ................................................ $ 717.00
> Air Pumps—3M Company ................................. $2,286.28

Masks, Face Pieces _____ $ 399.00

$3,402.67

Material and Equipment Mark-up—21% _____ $ 714.00

$4,117.23

Labor Costs—Mr. Paulsen with C–Tek—10 hrs @ $48.00 _____ $ 480.00

$4,597.23

Labor Costs—Ms. S. Rotolo, P.A. 10 hrs @ $36.00 _____ $ 360.00

Total _____ $4,957.23

We trust this meets with your acceptance and approval. Will you please issue your change order accordingly. Attached are copies of our purchase orders and payment dates of these items. If any further data or breakdown is required, please do not hesitate to contact us.[1]

---

The March 2, 1989 letter, again sent to Mr. Wm. Lawler (the contract manager), reported labor costs of $20,198.04:

Gentlemen:

With reference to our conversation(s) pertaining to the subject additional labor cost in removing the exhaust fans, being lined with lead, unknown to us, we are submitting the following breakdown. This request is in accordance to Item 8—Equitable Adjustments, Page 23 of the specifications.

Out [sic] added cost is a sum of TWENTY THOUSAND ONE HUNDRED EIGHTY NINE DOLLARS AND 04/100 ...$20,189.04

The breakdown is as follows:

| Area | System | Removal Date | Start Up | Add'l Hours | Cost |
|------|--------|--------------|----------|-------------|------|
| Pent # 12 S.E. | TR–1 | 04–16–87 | 07–16–87 | 60 | $ 2,186.40 |
| Pent # 4 | TR–2 | 10–20–86 | 05–15–87 | 32 | $ 1,153.28 |
| Pent # 3 | TR–3 | 08–08–86 | 10–20–86 | 42 | $ 1,513.68 |
| Pent # 12 N.E. | TR–4A&B | 01–20–87 | 05–18–87 | 70 | $ 2,550.80 |
| Pent # 12 N.E. | TR–5A&B | 06–20–86 | 09–29–86 | 50 | $ 1,802.00 |
| Pent # 2 | TR–6A&B | 07–10–87 | 08–10–87 | 60 | $ 2,186.40 |
| 12 Flr. S.W. | TR–7A&B | 11–10–86 | 03–24–87 | 80 | $ 2,883.20 |
| 12 Flr. S.W. | TR–8A&B | 06–18–86 | 03–24–87 | 92 | $ 3,315.68 |
| | | | | 486 | $17,591.44 |

Additional Field Supervision of 40 hours .................... $ 1,497.60
Lead Removal from Penthouses and Site ................... $ 1,100.00

TOTAL... $20,189.04

---

1. In its Amended Complaint, plaintiff indicates costs of $23,085.23, apparently reflecting the addition of the sums referred to in the April 4, 1988 and the April 6, 1988 letters.

Attached please find copies of our labor rates that applied during the removal dates and are reflected in the above costs. We would appreciate your answer within the next two (2) weeks or by March 20, 1989. If any additional data or information is needed so as to conclude this request, please do not hesitate to contact us.

---

On April 22, 1988, Irsay submitted an Invoice and Payment Authorization form, which was processed on June 10, 1988. The amounts claimed on this form, which was signed by William McDonald, Treasurer of the plaintiff, Irsay, once again, failed to include the $23,085.23 additional costs, later described in the letters dated April 4, 1988, April 6, 1988 and March 2, 1989. In fact, this form made claims for only the original, contract award price of $558,-269.00 and the November 25, 1986 Amendment–Modification price of $127,300.00. Plaintiff, in its Amended Complaint filed in this court, concedes that: "In preparing the Invoice and Payment Authorization request, Irsay mistakenly failed to include the additional charges for removing the lead lined ducts...."

Plaintiff first initiated a case in the United States District Court for the Northern District of Illinois on August 30, 1989. By some method, not described in the papers on file with this court, it appears that a copy, either of the April 6, 1988 or of the March 2, 1989 letters, which were attached to the plaintiff's complaint in the District Court, was sent to the contracting officer by the Assistant United States Attorney assigned to the District Court case. On October 31, 1989, the contracting officer wrote to the Vice President and Controller of the Robert Irsay Company, indicating that final payment had already been requested on April 22, 1988 and processed on June 10, 1988, and that, therefore, any subsequent claim must be denied. He stated that he based his decision on the Changes and Payments Clauses in the General Provisions included in the government's contract with the plaintiff.

On November 17, 1989, plaintiff filed a motion to transfer the action to the United States Claims Court. The motion was granted and the matter was transferred to this court on January 26, 1990. On February 12, 1990, plaintiff filed an Amended Complaint in this court. On April 12, 1990, defendant filed a "Motion to Dismiss for Lack of Jurisdiction," pursuant to Rule 12(b) of the Rules of the United States Claims Court. In its Motion to Dismiss, the defendant argues that plaintiff failed to submit a claim to the contracting officer on the $23,085.23, allegedly owed to plaintiff, and to receive a final decision, as required under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613. Plaintiff subsequently filed a "Memorandum in Opposition to Defendant's Motion to Dismiss," to which the defendant replied. Oral argument on the Motion to Dismiss was held on September 13, 1990.

### DISCUSSION

The Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988), requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to a contracting officer for a decision." *Id.* at § 605. No particular magic language or format is required to create a claim. The only requirement is that the contractor "submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir. 1987); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1395–96 (Fed.Cir. 1987); *see also, Tecom, Inc. v. United States,* 732 F.2d 935 (Fed.Cir.1984).

The prerequisites for jurisdiction have been further articulated to include at least the following additional factors. First, the

letter to the contracting officer requesting relief must specify the relief desired; second, in the letter, the contractor must assert specific rights; third, the letter must request a final decision from the contracting officer; fourth, the contracting officer must have issued a final decision, or failed to issue such a decision within the statutory time periods; and, finally, the letter must clearly indicate the amount of monetary compensation requested. *Cubic Corp. v. United States,* 20 Cl.Ct. 610, 616–17 (1990); *Mendenhall v. United States,* 20 Cl.Ct. 78, 82–83 (1990). Moreover, there is some authority that a claimant should indicate that the statutory basis for jurisdiction in this court is the Contract Disputes Act. *Hoffman Constr. Co. v. United States,* 7 Cl.Ct. 518, 526 (1985).

In the instant case, on November 25, 1986, the parties executed an unambiguous Amendment–Modification of the original contract in the additional amount of $127,300.00 to the contract price. This modification did not include the $23,085.23 now requested by the plaintiff in the lawsuit at bar. Moreover, the November 25, 1986 Amendment–Modification explicitly states that: "Contractor hereby agrees that this constitutes complete and final settlement for all present claims and a waiver of all further claims against the U.S. Postal Service incidental to the above changes" (the removal, disposal, furnishing and installation of new ductwork, exhaust hoods, equipment roof curbs).

The Invoice and Payment Authorization form, which also did not include the $23,085.23, was executed on April 22, 1988, and full payment was subsequently made. The contracting officer was not apprised of any correspondence requesting additional funds until after the full payment had been made. Plaintiff, therefore, failed to notify the Postal Service, in a timely fashion, of the $23,085.23 in additional costs, which plaintiff alleged resulted from the removal of the lead lining. In light of the clear, complete and final provision included in the contract Amendment–Modification, plaintiff certainly should have included the additional charges in the modification and in the Invoice and Payment Authorization form.

The plaintiff has argued that the April 4, 1988, April 6, 1988 and March 2, 1989 letters constitute a properly filed claim under the Contract Disputes Act and were presented in a form which would allow them to bring suit in this court. In fact, Irsay's letters were neither submitted to, nor addressed to, the contracting officer, Mr. Bryan. Rather, they were directed to Mr. Lawler, the contract manager. These letters appear to have reached the contracting officer fortuitously, and long after they were originally sent, courtesy of the Assistant United States Attorney, and only after the plaintiff filed his lawsuit in the Federal District Court for the Northern District of Illinois. This indirect receipt of a claim by the contracting officer does not satisfy the requirements of the Act. *West Coast Gen. Corp. v. United States,* 19 Cl.Ct. 98, 101 (1989). Strict compliance with the jurisdictional and statutory requirements of claims presentation is essential so that the contracting officer will recognize the matter at hand in order to take appropriate action. *Id., citing Technassociates, Inc. v. United States,* 14 Cl.Ct. 200, 209 (1988).

It is clear that a contracting officer lacks the authority to issue a decision on a submission that is not a properly filed claim under the Contract Disputes Act. Plaintiff contends that the contracting officer rendered a decision on October 31, 1989, satisfying the requirements of that Act. On the contrary, the Contract Disputes Act denies the contracting officer the authority to issue a decision at the instance of the contractor unless the claim has been properly submitted. *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 184, 645 F.2d 966, 971 (1981). *Straga v. United States,* 8 Cl.Ct. 61, 66–67 (1985). In *Straga,* the contracting officer rendered a final decision, however, since the claim was not properly submitted, the Claims Court found that it had no jurisdiction. Even where the contracting officer indicates that the jurisdictional requirement of the Contract Disputes Act has been satisfied, if the underly-

ing claim does not itself satisfy the requirements, jurisdiction is not conferred. *RSH Constr. Inc. v. United States*, 14 Cl.Ct. 655, 659 (1988). The jurisdictional prerequisites established by statute may never be waived by either party.[2] *Gardner Mach. v. United States*, 14 Cl.Ct. 286, 290 n. 1 (1988), (*citing W.H. Mosely Co. v. United States*, 230 Ct.Cl. 405, 406, 677 F.2d 850, 851, *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982)).

 In addition to the already enumerated jurisdictional inadequacies, the letters submitted by Irsay fail to state the basis for a claim and do not assert any specific rights, nor precise dollar amounts claimed, as reflected in the Amended Complaint. Although the April 4, 1988 and April 6, 1988 letters may indicate, if read together, the amount of the claim as included in the Amended Complaint, the sum of the amounts claimed in those letters ($23,-085.23) and the amount claimed in the March 2, 1989 letter ($20,189.05) are not the same. Moreover, each of the letters is insufficient to constitute a proper claim in that not one of them indicates the existence of a dispute, as defined in the Contract Disputes Act. *See Frawley v. United States*, 14 Cl.Ct. 766, 768 (1988). In fact, the April 4, 1988 and April 6, 1988 letters both request change orders and the March 2, 1989 letter requests an equitable adjustment. Requests for change orders or equitable adjustments, which are not even addressed to the contracting officer and have not been approved by that individual, cannot be considered claims under the Contract Disputes Act. The language in none of these letters describes a ripe dispute, ready for agency review, or refers to the Contract Disputes Act as the statutory basis for the plaintiff's claim.

The fact that plaintiff here makes no request for a final decision places the cor-

respondence even further outside of the definition of a claim under the Contract Disputes Act. The requisite degree of clarity necessary to a request of a final decision is clearly described in *Technassociates, Inc. v. United States*, 14 Cl.Ct. 200, 208–09 (1988). In that case, the court indicated that anything short of a demand for a final amount of money and a final decision is not a claim for the purposes of the Contract Disputes Act. *Id.* at 210. Although the March 2, 1989 letter indicates that an answer would be "appreciate[d]," there is no demand for money or for a decision pursuant to the Contract Disputes Act. Furthermore, the request is made under the Equitable Adjustments clause of the contract, confirming that the Contract Disputes Act is not the basis for the relief sought. Neither the April 4, 1988 letter or the April 6, 1988 letter makes even a colorable request for a final decision, nor is any legal basis cited as a foundation so that plaintiff's demand could be construed as a claim under the Contract Disputes Act.

 In addition, the plaintiff's prayer for relief asserted, according to the plaintiff, in the letters of April 4, 1988, April 6, 1988 and March 2, 1989, would have to be rejected because final payment had already been tendered prior to the time any of the letters was transmitted to the contracting officer. Final payment apparently was made on June 10, 1988, but the Assistant United States Attorney sent a copy of one of the letters to the contracting officer only after August 30, 1989, when plaintiff's original lawsuit was filed in the United States District Court for the Northern District of Illinois. It is clear that a contractor must indicate that he seeks recovery under a claim of right prior to the time final payment is made. Failure to do so extinguishes the claim. *Jo–Bar Mfg. Corp. v. United States*, 210 Ct.Cl. 149, 157, 535 F.2d 62, 66

---

**2.** The court reached the same conclusion in *Schlosser v. United States*, 705 F.2d 1336 (Fed. Cir.1983), holding that the contracting officer "had no authority to waive a requirement that Congress had imposed." *Id.* at 1338. Although *Schlosser* dealt with plaintiff's failure to certify a claim greater than $50,000, the absence of authority to waive a jurisdictional requirement

under the Contract Disputes Act applies equally to the instant situation. In *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 376, 685 F.2d 414, 419 (1982), the court, also addressing a certification deficiency, indicated that failure to satisfy the jurisdictional prerequisites "taint[s] every decision that follows."

(1976). In the case at bar, the plaintiff failed to seek such recovery prior to accepting final payment. Moreover, under the contract terms, the plaintiff was bound by the specific provision included in the November 25, 1986 Amendment–Modification which indicated that the changes in the Amendment–Modification (which did not include the $23,085.23) should constitute "complete and final settlement for all present claims and waiver of all further claims." The final payment to the plaintiff "bars consideration of any claims for damages under the contract which are submitted subsequent to the final payment." *Spirit Leveling Constr. v. United States*, 19 Cl.Ct. 84, 92 (1989). Once final payment has been tendered to the plaintiff, Irsay, pursuant to the April 22, 1988 Invoice and Payment Authorization form, Irsay should not be allowed to assert further claims under the contract. The contracting officer correctly responded to the plaintiff in his October 31, 1989, letter that final payment had been processed and, therefore, the claim should be denied.

Moreover, looking beyond the four corners of this unambiguous Amendment–Modification, there is also authority which indicates that allowing plaintiff to recover, without having made a timely claim, would be unfair to the government because it would allow recovery of costs without giving the government an opportunity to consider other alternatives. *E. Walters & Co.*

*v. United States*, 217 Ct.Cl. 254, 264–65, 576 F.2d 362, 368 (1978). *See also Dynalectron Corp. v. United States*, 207 Ct.Cl. 349, 366, 518 F.2d 594, 603 (1975), in which the court noted that "[t]he waiver doctrine rests on the premise that delay in asserting rights prejudices the government by running up recoverable costs." In the instant case, the government officials responsible for committing the United States Postal Service to the terms of any additional indebtedness were clearly deprived of the opportunity to consider other options, including that of electing not to incur $23,085.23 in additional costs.

### CONCLUSION

Because the plaintiff, the Robert Irsay Company, failed to present either a proper or timely claim to the appropriate government official as required by the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988), and for the reasons discussed above, defendant's Motion to Dismiss is, hereby, GRANTED.

IT IS SO ORDERED.