**KANAG'IQ CONSTRUCTION COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–768C.**

United States Court of Federal Claims.

Nov. 28, 2001.

John Lukjanowicz, Seattle, WA, for plaintiff.

Mark L. Josephs, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Pamela A. Parker, United States Department of Health and Human Services, Seattle, WA, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after transfer on November 1, 2001; briefing on defendant's pending motion for partial dismissal and for partial summary judgment was completed on April 29, 1999. The issues for decision are 1) whether certain of plaintiff's claims were timely filed under the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(3) (1994) (the "CDA"), which requires that "[a]ny action ... shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim;" and 2) whether certain of plaintiff's other claims are barred by accord and satisfaction. Although defendant addresses the first issue through a motion pursuant to RCFC 12(b)(1), dismissal for lack of subject matter jurisdiction, the Federal Circuit has held that the CDA's one-year limitations period does not implicate the court's subject matter jurisdiction, but has suggested that it goes to the validity of the claim upon which relief is sought. *Borough of Alpine v. United States*, 923 F.2d 170, 171–72 (Fed.Cir.1991); *see also Policy Analysis Co. v. United States*, 50 Fed.Cl. 626, 627, 2001 U.S. Claims LEXIS 182, at *1 (2001). Accordingly, defendant's motion will be treated as under RCFC 12(c), and, as defendant has submitted materials outside the pleadings, its motion, in turn, will be considered under RCFC 56. *See* RCFC 12(c); *Schy v. Susquehanna Corp.*, 419 F.2d 1112, 1115–16 (7th Cir.1970); *Policy Analysis*, 50 Fed.Cl.

at 627, 2001 U.S. Claims LEXIS 182, at *2. Argument is deemed unnecessary.

## FACTS

The following facts are undisputed, unless noted otherwise. Kanag'Iq Construction Company ("plaintiff") entered into Contract No. 109–80–0020 with the United States Department of Health and Human Services ("HHS") on May 19, 1989, to perform architectural and electrical repairs and renovations on an Indian Health Service Building in Sitka, Alaska. During the course of contract performance, the contract was modified nine times. Three of the modifications were unilateral, and six were bilateral. Defendant's motion involves one of the unilateral modifications and each of the bilateral modifications.

The unilateral modification at issue, Modification No. 3, concerns the parties' attempts to address the presence of asbestos in a crawl space through which the contract called for the routing of conduit and feeder cables. On June 22, 1989, the contracting officer's representative (the "COR") held a preconstruction meeting with plaintiff, and advised plaintiff of the presence of asbestos in the crawl space. On August 15, 1989, at HHS's request, plaintiff submitted a proposal to effect a major rerouting of the electrical work from the crawl space at an additional cost of $18,330.88. HHS rejected this proposal as too costly. On August 29, 1989, HHS proposed a minor rerouting that would continue to run the electrical equipment through the crawl space, but that would require HHS to provide the labor for installation of the conduit in the asbestos-contaminated area, with plaintiff supplying the materials. Plaintiff submitted a revised cost proposal on September 5, 1989, increasing the contract price by $2,418.00.

Although the record as it exists has not explained adequately the basis for this fig-

ure, it appears to represent plaintiff's estimate of the costs to core concrete walls and changes in the amount of materials required under HHS's plan. Plaintiff's claim for concrete coring costs involves the routing of cable through non-contaminated areas. Contrary to the building plans that HHS submitted to plaintiff, plaintiff alleges that the internal walls were made of concrete, rather than plywood.[1] Plaintiff appears to have regarded its September 5 cost proposal as "trading" its concrete coring service in exchange for the Government's installation of electrical equipment in the asbestos-contaminated area. The $2,418.00 figure therefore appears to be the cost of the coring, discounted for the installation labor costs saved.

HHS rejected this figure as well, maintaining that the change in work required a price decrease to reflect the government-furnished labor. Modification No. 3, dated October 12, 1989, unilaterally changed the contract to implement HHS's plan. The modification required that HHS "provide the labor required to install and adequately support rigid conduit in the area of the crawl space that is known to contain asbestos" and required plaintiff to "provide the materials fabricated to fit the conditions in the crawl space." Modification No. 3 decreased the contract price by $1,073.00 to account for the reduction in the labor called for under the contract.

On November 17, 1989, plaintiff wrote to the contracting officer.

> We are not in agreement with Modification # 3 . . . . If the government charges for the labor provided, then the government should pay for the coring required . . . plus Kanag'Iq's mark up for a total of $1660.[2]

On December 1, 1999, the contracting officer issued a "Final Contracting Officer's Decision" that treated plaintiff's November 17 letter as a claim for compensation. The decision denied the claim based on HHS's position that plaintiff bore the risk that the walls

---

1. The parties dispute the allocation of the risk of this discrepancy under the contract.

2. Plaintiff considered the reduction in contract price in Modification No. 3 to be the Government's "charge" for its labor, thereby rejecting the "trade" offered in plaintiff's September 5

cost proposal and leaving plaintiff uncompensated for its concrete coring costs. Although plaintiff's September 5 cost proposal estimated coring costs at $2,418.00, plaintiff now claims $1,660.00 for these costs.

were constructed of concrete, thereby requiring coring. The decision advised plaintiff:

> This is a final decision of the Contracting Officer. Your [sic] may appeal it to the Armed Services Board of Contract Appeals .... If you desire to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals ....
>
> Instead of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Claims Court [predecessor to the Court of Federal Claims] within 12 months of the date you receive this decision.

Plaintiff acknowledged receipt of the decision by letter of December 6, 1989, and requested additional information regarding the procedures for appeal. In that letter, plaintiff referred to its November 17 letter as a "claim for additional compensation for electrical routing and coring costs." The contracting officer responded by forwarding to plaintiff a copy of subpart 33.2 of the Federal Acquisition Regulations, 48 C.F.R. (FAR) (2000), "Disputes and Appeals."

Plaintiff did not appeal the contracting officer's December 1, 1989 decision. Defendant therefore argues that plaintiff's claim for costs relating to the asbestos contamination is untimely under section 609 of the CDA, which establishes a 12–month period for filing a lawsuit. Plaintiff rejoins that its November 17 letter was not a "claim" for purposes of the CDA, so that it was under no obligation to appeal the contracting officer's decision.

Defendant's motion also addresses the six bilateral modifications. These modifications typically originated with requests for proposals ("RFP's") issued by the COR to address unanticipated circumstances encountered during performance. The modifications were executed under the "Changes" clause of the contract. Each bilateral modification addressed the cost and time impacts of various changes to the work called for under the contract and added or deducted money and/or time "by reason of this modification." Each stated that "[e]xcept as provided herein," all other terms of the contract remained in full force, and each was signed by both parties to the contract. None of the bilateral modifications contained a "Contractor's Statement of Release," and in none of the bilateral modifications did plaintiff expressly reserve the right to claim an equitable adjustment for other costs associated with the modification.

Defendant contends that the six bilateral modifications operate as accords and satisfactions that bar any claims plaintiff may have for costs arising out of the subjects of the modifications. The parties, however, disagree on the facts surrounding the negotiation of the bilateral modifications. In discussions concerning the RFPs, defendant argues that the contracting officer specifically invited plaintiff to include overhead and profit in its responsive cost proposals. Plaintiff concedes the point and admits that it did include overhead and profit in its costs proposals and that these costs were included in the bilateral modifications. Nonetheless, plaintiff insists that the contracting officer specifically advised plaintiff that it could not claim administrative costs associated with preparing the cost proposals. Plaintiff further posits that the bilateral modifications did not cover all of plaintiff's "indirect" costs, particularly those it now claims in this case.

## DISCUSSION

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and there are no disputes over material facts that may significantly affect the outcome of the suit. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. The moving party bears the burden of demonstrating the absence of genuine disputes over material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. *Anderson*, 477 U.S. at

255, 106 S.Ct. 2505. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.; accord H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). Although summary judgment is designed " 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed. R. Civ. P. 1), a trial court may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

1. *Whether plaintiff's November 17, 1989 letter constitutes a claim*

The CDA stipulates that "[a]ny action ... shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim." 41 U.S.C. § 609(a)(3). The CDA further provides: "The contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter." *Id.* § 605(b) (1994).

For purposes of the CDA, defendant asserts that plaintiff's November 17, 1989 letter was a claim for costs arising out of the third, unilateral, modification and that the December 1, 1989 final contracting officer's decision denying that claim triggered the 12–month statute of limitations. Plaintiff's position is that its November 17 letter was not a claim because it did not request a final decision, thereby rendering the contracting officer's final decision a "nullity." Pl.'s Br. filed Apr. 13, 1999, at 9. Alternatively, plaintiff argues that, even if the November 17 letter constitutes a claim, that claim is limited to concrete coring costs and not delay costs.

Section 605(a) of the CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision," but does not otherwise define the term "claim." In *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed.Cir.1995) (en banc), the Federal Circuit applied the definition of "claim" contained in FAR § 33.201(1). *Reflectone* held that the FAR "sets forth the only three requirements of a non-routine [3] 'claim' for money: that it be 1) a written demand, 2) seeking, as a matter of right, 3) the payment of money in a sum certain." 60 F.3d at 1575. Beyond satisfying the FAR definition of a claim, the CDA also requires that all claims be submitted to the contracting officer "for a decision." 41 U.S.C. § 605(a); *see also* FAR § 33.206 (identical phrase); *Rex Sys., Inc. v. Cohen,* 224 F.3d 1367, 1371–72 (Fed.Cir.2000) (noting that requirement that claim be submitted "for a decision" is statutory and therefore in addition to requirements imposed by the FAR); *James M. Ellett Const.,* 93 F.3d at 1543 & n. 4 (same); *Bill Strong Enters., Inc. v. Shannon,* 49 F.3d 1541, 1550 (Fed.Cir. 1995) (submission "cannot be considered a formal CDA claim since [it] did not request a final decision of the CO"), *overruled in part on other grounds by Reflectone,* 60 F.3d at 1579 & n. 10.

The phrase "for a decision" does not require an explicit request for a final decision, "as long as what the contractor desires by its submissions is a final decision, that prong of the CDA claim test is met." *James M. Ellett Const.,* 93 F.3d at 1543 (quoting *Transamerica Ins. Corp., Inc. v. United States,* 973 F.2d 1572, 1576 (Fed.Cir. 1992), *overruled in part on other grounds by Reflectone,* 60 F.3d at 1579 & n. 10). "Thus, 'a request for a final decision can be implied

---

3. The parties have not argued that the claim was submitted as a "voucher, invoice or other routine request for payment." FAR § 33.201(1). A routine request " 'is made under the contract, not outside of it,' " while a non-routine request "seek[s] compensation because of unforeseen or unintended circumstances." *James M. Ellett Const. Co. v. United States,* 93 F.3d 1537, 1543

(Fed.Cir.1996) (quoting *Reflectone,* 60 F.3d at 1577). A request for an equitable adjustment "is anything but a 'routine request for payment' " and "can hardly be compared to an invoice, voucher or progress payment." *Reflectone,* 60 F.3d at 1577 (citing *Crown Coat Front Co. v. United States,* 386 U.S. 503, 511, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967)).

from the context of the submission.' " *James M. Ellett Const.*, 93 F.3d at 1543 (quoting *Heyl & Patterson, Inc. v. O'Keefe*, 986 F.2d 480, 483 (Fed.Cir.1993), *overruled in part on other grounds by Reflectone*, 60 F.3d at 1579 & n. 10); *accord Rex Sys.*, 224 F.3d at 1372. The contracting officer must use no "magic words;" rather, "the intent of the 'claim' governs," and the court applies a "common sense analysis" to determine whether the contractor communicated his desire for a contracting officer's decision. *Transamerica*, 973 F.2d at 1578, 1579; *accord Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). Where "there is no implication that plaintiff desired a final decision, no claim exists under the CDA as implemented by the FAR." *Heyl & Patterson*, 986 F.2d at 486. The fact that the contractor may express a desire to settle or negotiate the dispute or meet with the Government to discuss the matter will not necessarily prevent a finding that the contractor's submissions requested a final decision. *Transamerica*, 973 F.2d at 1577–79; *Contract Cleaning*, 811 F.2d at 592. "All that is required is that the contractor submit in writing to the contracting officer adequate notice of the basis and amount of the claim." *Transamerica*, 973 F.2d at 1578 (quoting *Contract Cleaning*, 811 F.2d at 592).

█ Plaintiff correctly points out that the letter itself contains no explicit request for a final decision, nor, according to plaintiff, can such a request be implied from the letter. As a threshold matter, plaintiff argues that its November 17 letter cannot constitute a claim under the Disputes clause because it was submitted as a request for an equitable adjustment under the Changes clause. *Reflectone* squarely held that a request for an

equitable adjustment "provides an example of a written demand for payment as a matter of right which is not 'a routine request for payment' and, therefore, it satisfies the FAR definition of 'claim.' " 60 F.3d at 1577; *accord James M. Ellett Const.*, 93 F.3d at 1543.

Plaintiff cites *Robert Irsay Co. v. USPS*, 21 Cl.Ct. 502, 508 (1990), for the following quotation: "[W]here request is made under the Equitable Adjustments clause of the contract, there is no 'claim' under the Contracts Disputes Act." Pl.'s Br. filed Apr. 13, 1999, at 9. Nowhere in the court's opinion does this quotation appear, although there is language to this effect. In *Robert Irsay* the Claims Court found that a request for an equitable adjustment did not constitute a claim under the CDA. The fact that the communication at issue in that case was a request for an equitable adjustment, however, was only one of several factors that underlay the court's conclusion. The court also relied on the facts that the communication did not state the basis for the claim, did not assert any specific rights, did not request a specific amount of money, and was not addressed to the contracting officer. 21 Cl.Ct. at 507–08. To the extent that *Robert Irsay* did suggest a categorical rule that a request for an equitable adjustment is inconsistent with a claim under the CDA, it must yield to the Federal Circuit's decisions in *Reflectone* and *James M. Ellett Const.*[4]

Plaintiff argues that "[i]t would certainly create a trap for the unwary if [a contractor], in complying with the Government's advice to assert its right to an adjustment if it didn't consider the unilateral contract modification to be adequate ..., were determined to have filed a 'claim' with the Government by re-

---

**4.** Cases prior to *Reflectone* are suspect insofar as they were decided in light of the Federal Circuit's decision in *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 878 (Fed.Cir.1991), which held: "Clearly, the FAR mandates that, *inter alia*, a claim must seek payment of a sum certain as to which a dispute exists at the time of submission." To the extent that these courts were concerned with whether a dispute had arisen prior to the request for compensation, the fact that the request was made as one for an equitable adjustment may have carried greater weight. *See, e.g., Bill Strong Enters.*, 49 F.3d at 1544–45, 1550 ("[The] submission was not a formal CDA claim

because the Government did not at that time dispute [plaintiff's] assertion of a right to increased compensation."); *Heyl & Patterson*, 986 F.2d at 485–86 (reciting the above quotation from *Dawco*); *Robert Irsay*, 21 Cl.Ct. at 508 ("The language in none of these letters describes a ripe dispute, ready for agency review ...."). Although the FAR requires that a "dispute" exist insofar as the contractor must seek payment "as a matter of right," FAR § 33.201(1), the broader preexisting dispute requirement of *Dawco* was overruled by the Federal Circuit's en banc opinion in *Reflectone*. 60 F.3d at 1579.

sponding to such language." Pl.'s Br. filed Apr. 13, 1999, at 9. The court discerns no such trap; instead, this case illustrates one way that requests for equitable adjustments become appealable claims under the CDA. *See also Reflectone,* 60 F.3d at 1580 (requiring contractor to resubmit demand for payment after contracting officer has denied it is "inimical to at least two goals of the CDA: providing for the efficient and fair resolution of contract claims").

██ Plaintiff attempts to make a factual issue out of its intent in sending the November 17 letter. Nevertheless, "[a]ll that is required is that the contractor submit in writing to the contracting officer adequate notice of the basis and amount of the claim." *Transamerica,* 973 F.2d at 1578. The November 17 letter does precisely that: It requests $1,660.00, attaching an itemized breakdown of the amount sought and explaining that the amount is based on coring costs associated with the rerouting of conduit caused by the asbestos contamination and plaintiff's mark up.

Although plaintiff does not dispute this characterization of its letter, it argues that other facts control whether the letter should be regarded as a claim: "The letter merely responded to language found in the Government's October 17, 1989 letter and in the modification itself." Pl.'s Br. filed Apr. 13, 1999, at 8. Plaintiff argues that the letter "is best categorized as a presentation of its contrary views to the action the Government was taking." *Id.* There is no infirmity in a claim's being made in response to a Government communication. Indeed, any claim that reaches the Court of Federal Claims necessarily presented a view that is contrary to the Government's.

Plaintiff also argues that the language of the November 17 letter is precatory, rather than mandatory, because "[n]o demands or threats of future legal action are made." *Id.* Instead, plaintiff argues that the letter is simply a "reminder" of the Government's obligations. Whether this is a distinction with a difference, all that is required under the CDA and the FAR is a written demand for the payment of money in a sum certain, which the contractor believes is owed to it as a matter of right. FAR § 33.201(1); *Reflectone,* 60 F.3d at 1575. Plaintiff's letter demands a sum certain and conveys its position that the Government "should pay" this amount. In fact, plaintiff acknowledges that the letter "assert[ed] its right to an 'adjustment' under the contract." Pl.'s Br. filed Apr. 13, 1999, at 9. Moreover, in its December 6, 1989 letter to the CO, plaintiff referred to its November 17 letter as a "claim for additional compensation for electrical routing and coring costs."

Finally, the court notes that the Federal Circuit also has considered persuasive whether the Government considered a given communication to be a claim. *Transamerica,* 973 F.2d at 1578–79 n.2; *Contract Cleaning Maintenance,* 811 F.2d at 592. Of course, the contracting officer cannot issue a final decision without a properly submitted claim. *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 184, 645 F.2d 966, 971 (1981). Nonetheless, the contracting officer's treatment of the letter has bearing on that letter's meaning. The contracting officer was explicit in his treatment of the November 17 letter as a claim, and his December 1, 1989 final decision advised plaintiff of the significance of the decision and of its right to appeal. Plaintiff acknowledged receipt of the decision by letter of December 6, 1989, in which plaintiff requested additional information regarding appeal procedures. The contracting officer then forwarded to plaintiff a copy of FAR subpt. 33.2, "Disputes and Appeals."

Essentially, plaintiff's only argument is that, whatever the November 17 letter stated, plaintiff did not intend it to be a request for a final decision. Applying the "common sense analysis" required by *Transamerica,* 973 F.2d at 1579, the court deems plaintiff's arguments insufficient to create a genuine issue of fact and defeat summary judgment.

> This court is loathe [sic] to believe that in this case a reasonable contractor would submit to the contracting officer a letter containing a payment request after a dispute had arisen solely for the contracting officer's information and without at the very least an implied request that the contracting officer make a decision as to entitlement. Any other finding offends logic.

*Id.* at 1578. The November 17 letter was submitted in writing to the contracting officer and demanded the subcontractor's coring costs and its own mark up as a matter of right. The letter gave the contracting officer adequate notice of the basis and amount of the claim.[5]

Beyond requesting a ruling that the November 17 letter constitutes a claim, defendant contends that the letter encompasses all of plaintiff's costs relating to the asbestos contamination. This is simply not so. The letter requests only 1) the subcontractor's coring costs and 2) plaintiff's mark up. Plaintiff attached to its November 17 letter an itemized breakdown of the subcontractor's coring costs that included the subcontractor's overhead and profit. Defendant does not identify which, if any, of the indirect costs claimed in this case were claimed as mark up in plaintiff's November 17 letter. Thus, the court rejects the characterization "that [plaintiff's] letter sought all costs, both direct and indirect, that [plaintiff] allegedly had incurred as a result of the asbestos contamination addressed in the unilateral contract modification." Def.'s Br. filed Apr. 29, 1999, at 6.

■ The CDA recognizes that a single government contract may give rise to more than one claim and that a contractor may pursue its rights by filing "two or more suits" in either one or more fora. 41 U.S.C. § 609; *accord Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed.Cir.1990). The only limitation that the courts have placed on the contractor's ability to split its claims is that a single, unified claim based on a common and related set of facts cannot be fragmented for the purpose of eluding the CDA's certification requirement. *Placeway*, 920 F.2d at 907. Although defendant suggests that a decision that becomes final and unreviewable under section 605 precludes a contractor from asserting any additional claims arising out of the same circumstances, defendant cites no authority to this effect,

nor does it offer any reason why this court should subscribe to such a theory.

### 2. *Bilateral modifications*

■ "Discharge of a claim by accord and satisfaction occurs when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." *Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1581 (Fed.Cir.1993); *accord Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58, 343 F.2d 951, 955 (1965) (quoting 6 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1276 (1962)). "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Brock & Blevins*, 170 Ct.Cl. at 59, 343 F.2d at 955. The process of making an accord requires

> accompanying expressions sufficient to make the [obligee] understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise. If not so rendered, there is no accord, either executory or executed, for the reason that there are no operative expressions of agreement—no sufficient offer and acceptance.

*Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 109, 654 F.2d 711, 716 (1981) (quoting 6 CORBIN § 1277).

■ Generally, an executed bilateral contract modification that contains no reservation of rights constitutes an accord and satisfaction. *See Brock & Blevins*, 170 Ct.Cl. at 58–59, 343 F.2d at 955; *Cannon Constr. Co. v. United States*, 162 Ct.Cl. 94, 99–100, 319 F.2d 173, 177 (1963). This is so because modifications normally contain a provision that discharges any and all claims the contractor may have arising out of the modification. FAR § 43.204(c) (2000) instructs:

> To avoid subsequent controversies that may result from a supplemental agreement

---

**5.** Defendant notes in passing that the contracting officer's final decision also responded to a November 13, 1989 letter from plaintiff's subcontractor requesting an additional $2,049.00 arising out of the solution to the asbestos con-

tamination. Without more, the court does not read defendant's motion to argue that this letter constitutes an additional claim or part of plaintiff's November 17 claim.

containing an equitable adjustment as the result of a change order, the contracting officer should—

. . . .

(2) Include, in the supplemental agreement, a release similar to the following:

### CONTRACTOR'S STATEMENT OF RELEASE

■ In consideration of the modification(s) agreed to herein as complete equitable adjustments for the Contractor's . . . . . . . . . . (describe) . . . . . . . . . "proposal(s) for adjustment," the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the "proposal(s) for adjustment" (except for . . . . . . . . . .).

*See Craddock v. United States*, 230 Ct.Cl. 991, 994, 1982 WL 25300 (1982); *cf. Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). The rule requiring explicit reservation of claims is simply a corollary to the parol evidence rule: Where a contract is not ambiguous, extrinsic evidence may not be used to vary the terms of the agreement. *E.g. Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988) ("The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face."); *Safeco Credit v. United States*, 44 Fed.Cl. 406, 419 (1999) (refusing to import ambiguity into unambiguous language regarding accord and satisfaction in bilateral modification). Accordingly, where a bilateral modification contains an express provision regarding discharge, a contractor cannot later attempt to narrow the scope of the accord beyond its express reservations.

■ Because none of the bilateral modifications at issue in this case contains the Contractor's Statement of Release advised by FAR § 43.204(c), the rule requiring ex-

plicit reservation of claims does not apply.[6] Even so, the absence of an express provision regarding discharge does not preclude the finding of an accord. *See Mingus*, 812 F.2d at 1391 n. 4; *McLain Plumbing & Elec. Serv., Inc. v. United States*, 30 Fed.Cl. 70, 78–79 (1993). The court therefore must examine the totality of the circumstances to determine whether a meeting of the minds occurred concerning an accord—whether there were "accompanying expressions sufficient to make the [obligee] understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise." *Chesapeake & Potomac*, 228 Ct.Cl. at 109, 654 F.2d at 716; *see also Tex. Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed.Cir.1990) ("Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances."). The parties' intent in entering into such a contract is a question of fact. *Cf. Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed.Cir.2000).

■ The fact-intensive nature of the court's inquiry into the scope of the meeting of the minds is a poor candidate for summary judgment. Although common sense strongly suggests that the bilateral modifications constitute accords regarding any equitable adjustments arising out of the changed work, common sense cannot resolve a genuine issue of material fact, particularly when that fact is the intent of the parties. Similarly, plaintiff's claims for costs encountered as a result of HHS's delay are undercut insofar as the modifications extending the contract completion date put plaintiff on notice that some 120 additional days would be added to the contract. *See* Pl.'s Identification of Claim Issues filed Nov. 21, 1997, at 2. Just as common sense would suggest that the price increase encompasses the direct costs of the changed work, common sense suggests that the price increase would also include the indirect costs of established or foreseeable delays. Yet,

---

**6.** Neither party has addressed whether the absence of a discharge provision results in an ambiguity. Moreover, to the extent that defendant argues the unreasonableness of plaintiff's contention that the modification did not include certain

costs, defendant appears to concede that no patent ambiguity exists. *See, e.g., Lockheed Martin IR Imaging Sys. v. West*, 108 F.3d 319, 322–23 (Fed.Cir.1997).

absent an express provision regarding discharge, or other conclusive evidence regarding the parties' intent, the court cannot find that such costs were within the scope of these particular modifications.

Not only is a provision regarding discharge absent, but no other language on the face of the modifications demonstrates the parties' intent beyond dispute. Defendant points to language indicating that the changes to the contract price and completion date were granted "by reason of this modification." While this supports the above interpretation that the modifications constitute accords as to any claims arising from the changed work, the language cannot be accepted as dispositive.

The difficulty determining the scope of the bilateral modifications is illustrated by defendant's failure to identify which claims are barred by accord and satisfaction. While the precise nature of plaintiff's claims is not clear, defendant has moved for summary judgment "As To The Portion Of Plaintiff's Claim Arising Out Of The Subjects Of Bilateral Contract Modifications." Def.'s Br. filed Jan. 29, 1999, at 15. Plaintiff's complaint currently seeks $6,438.00 in "direct" costs and $87,062.00 in "indirect" costs, such as "additional and extended project administration, extended equipment costs, both operating and standby, and unabsorbed home office overhead." Pl.'s Br. filed Apr. 13, 1999, at 11.

Defendant has made no attempt to connect plaintiff's direct cost claims with the bilateral modifications. Defendant instead focuses on plaintiff's claims for indirect costs, such as extended overhead. Defendant argues that, in negotiating modification, the COR instructed plaintiff to include overhead and profit in its cost proposals. Defendant offers the COR's September 6, 1989 letter as an example:

When preparing your cost proposals please follow the direction given to you from the Contracting Officer: 1) 10% overhead is the maximum allowed unless accounting information from the prime or sub can substantiate a higher rate (determination made by CO); 2) 10% profit will be permitted for the subcontractor and only 5% for the prime in instances where the change order is primarily a subcontracted for item; and 3) for deducted work, the same overhead and profit for subcontractor and price are to be shown as deducted in the cost proposal.

Plaintiff acknowledges that its cost proposals included "overhead and profit," Pl.'s Statement of Genuine Issues, filed Apr. 13, 1999, ¶ 4, but insists that this term does not encompass the impact and delay costs that it now claims.

"Unabsorbed" (or "extended") overhead refers to overhead costs incurred during a period where the Government has reduced the amount of work the contractor can perform. As a result, a contractor continues to incur overhead, but has no direct cost basis over which to allocate overhead. The overhead is said to be "unabsorbed" by the contract, and a contractor is entitled to recover based on the so-called *"Eichleay"* calculation. *E.g., Charles G. Williams Constr., Inc. v. Sec'y of the Army,* 271 F.3d 1055, 1056–57 (Fed.Cir.2001). A contractor also may recover the cost of contractor-owned equipment incurred over an extended contract period. *Cmty. Heating & Plumbing,* 987 F.2d at 1581. "The *raison d'etre* of *Eichleay* requires at least some element of uncertainty arising from suspension, disruption or delay of contract performance." *Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1057 (Fed.Cir.1993); *C.B.C. Enter., Inc. v. United States,* 978 F.2d 669, 675 (Fed.Cir. 1992). The court cannot conclude that the evidence of record supports a finding that unabsorbed overhead was considered in pricing the bilateral modifications.[7]

Plaintiff also seeks the administrative costs associated with preparing cost proposals.[8]

---

7. Defendant did not challenge whether these delay costs are compensable, only whether they fall within the scope of the bilateral modifications. To the extent that the bilateral modifications extended the contract completion date by 53 days, *see* Pl.'s Identification of Claim Issues filed Nov. 27, 1997, at 2, plaintiff therefore was on notice that it had, or would, incur additional indirect costs during the course of the contract.

8. Plaintiff appears to consider the time required to prepare cost proposals to be an "additional extended project administration" cost. Pl.'s Br.

The COR advised plaintiff that HHS would not reimburse plaintiff for the administrative costs associated with preparing cost proposals, as those expenses already were being compensated through the administrative overhead rate. Defendant reasonably argues that, if this was the position taken by HHS when the final price increases were calculated, and this position had been communicated to plaintiff, then plaintiff should have refused to sign the modifications. The modifications, however, contain no language to this effect, and defendant has not offered any evidence to fill the void. Without an express provision regarding discharge, or other conclusive evidence regarding the parties' intent, the court cannot find that such costs were within the scope of the modifications.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for partial summary judgment is granted as to plaintiff's claim for subcontractor's coring costs and its mark-up stemming from Modification No. 3 and is otherwise denied.

2. The parties shall file a Joint Status Report by December 17, 2002, proposing a course of proceeding to resolve plaintiff's remaining claims, with trial to commence no later than July 15, 2002.

filed Apr. 13, 1999, at 11. Defendant did not challenge whether these costs are allowable, only

